## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

---

CEMENT AND CONCRETE WORKERS
DC BENEFIT FUND,
on its own behalf and on behalf of
all others similarly situated,

          Plaintiff,

          v.

THE NEW YORK AND
PRESBYTERIAN HOSPITAL,

          Defendant.

Case No. 25-cv-6140

JURY TRIAL DEMANDED

---

## CLASS ACTION COMPLAINT

---

Plaintiff Cement and Concrete Workers DC Benefit Fund ("CCWDC Welfare Fund" or "Plaintiff"), individually and on behalf of all others similarly situated, brings this civil antitrust action against Defendant The New York and Presbyterian Hospital ("NYP" or "New York Presbyterian"). This action seeks damages and an injunction forbidding NYP from using unlawful contract restrictions that prevent New York health plans and insurers from incentivizing patients to use higher-value healthcare services offered by NYP's competitors. These unlawful restrictions restrain trade, reduce competition, and harm New York employers, unions, insurers, and consumers.

## I.     NATURE OF THE ACTION

1.     This is an action for unlawful restraint of trade under the Sherman Act, 15 U.S.C. § 1, seeking classwide damages and injunctive relief.

2.     NYP is a New York health system providing a comprehensive range of healthcare services across several campuses in New York City and its surrounding regions.  NYP's flagship facilities are Columbia University Irving Medical Center and Weill Cornell Medical Center.  It also operates several other general acute-care hospitals and outpatient medical facilities in New York City and its surrounding regions.  NYP is one of the nation's largest hospital systems, with 2023 operating revenues of approximately $12.5 billion.  NYP is the most expensive hospital system in New York.

3.     NYP has market power in the market for acute inpatient hospital services.  It abuses its market power in its dealings with self-funded employers, unions, health insurers, and their vendors.  NYP's market power results from, among other things, its large size, significant barriers to entry in the market, the comprehensive range of healthcare services it offers, the nature of the market for hospital services, patient demand, and employers', unions' and insurers' need to include access to NYP's hospitals—as well as its other facilities and providers—in at least some of their provider networks in insurance plans that cover people who live and/or work in New York City.

4.     The anticompetitive conduct at issue in this case relates to "steering" and, more specifically, NYP's aggressive "anti-steering" tactics.  Insured patients typically do not pay the full cost of their medical care (instead, their employer or insurance company does), so patients are often price-insensitive when choosing where to receive medical care.  "Steering" refers to various methods by which health plans and insurers encourage members to obtain medical care from lower-cost and/or higher-quality providers when medically appropriate and/or to discourage their use of higher-cost and/or lower-quality providers.  For example, health plans or insurers might offer their members lower co-pays or more generous co-insurance benefits if they use lower-cost providers who offer the same or better quality services than higher-cost providers.

5.     One popular type of steering is the use of "tiered" networks.  Health plans using tiered networks assign healthcare providers to different "tiers," with better value healthcare services (lower cost, higher quality) in the top tier.  The plans then set lower out-of-pocket costs for members when they use top-tier providers instead of providers in other tiers.  This incentivizes the members to choose top-tier providers, which in turn reduces costs for the health plan.

6.     Another steering tool is the use of "narrow network" insurance plans.  As their name suggests, narrow networks consist of a smaller set of healthcare providers than is conventional, and typically exclude the most expensive providers.  A member who chooses a narrow-network insurance plan typically pays lower premiums and lower out-of-pocket expenses than a member who chooses a conventional broad-network insurance plan, which incentivizes the member to accept a smaller network of providers for his or her healthcare needs.  That member's use of the narrow-network plan reduces costs for the health plan.

7.     Extensive research demonstrates that these and other forms of steering significantly reduce the cost of healthcare for employers, unions, insurers, and consumers.  These savings result for two principal reasons.  First, steering causes more insured patients to obtain treatment from lower-cost providers when they might otherwise have selected a higher-cost provider, which directly reduces their health plan's expenditures, and often their own.  Second, steering—and the threat of steering—places competitive pressure on higher-cost providers to lower their prices.  Providers are motivated to have health plans steer towards them (or at least not to steer away from them) because of the increased patient volume that steering generates for the providers to whom patients are steered (and the decreased volume for providers patients are steered away from).  Thus, the ability of employers, unions, and insurers to steer gives providers a powerful incentive to be as efficient as possible, maintain low prices, and offer high quality and innovative services.  This

benefits employers, unions, insurers, and other direct payers for medical services tremendously by lowering their healthcare expenses.

8.      NYP uses its market power to block employers, unions, and insurers from using steering to direct patients to higher-value care from non-NYP facilities.  NYP does so to protect itself against steering that would deprive it of patient volume, induce price competition, and require it to lower its extremely high prices.  Specifically, NYP uses its market power to force health plans and insurers, as a condition of including any NYP facilities in their insurance networks, to agree to anticompetitive "anti-steering" restraints.  One such anti-steering restraint NYP forces onto all or nearly all commercial health plans with which it contracts is a contractual clause known as the "All Products Clause," which requires an insurer that wishes to include NYP in *any* of its health plans to include NYP in *all* of its health plans, at the highest tier or benefit level—regardless of cost or quality.  The All Products Clause, and other restraints NYP forces insurers to include in their contracts with NYP, forbid health plans and insurers from offering their members financial incentives or designing other inducements to encourage their members to obtain care from non-NYP providers.  Because of NYP's market power, health plans and insurers generally have no choice but to accede to NYP's demands.  These anti-steering restraints unlawfully insulate NYP from competition and have allowed NYP to persistently charge higher prices to New York businesses, unions, local governments, insurers, and taxpayers.

9.      Insurers, employers, unions, and their health plans, including Plaintiff, would like to use steering to lower their healthcare costs, but NYP's restraints prevent them from doing so.

10.     NYP's anticompetitive conduct results in higher prices paid by New York employers, unions, insurers, and individuals for healthcare.  NYP's high prices are apparent in common, high-volume procedures like joint replacements, which at NYP's facilities cost $37,456

more than at NYU Langone, a competitor with higher safety and quality ratings, representing a 68% premium charged by NYP for the same procedure. And they are apparent in cumulative numbers that show NYP is by far the most expensive hospital system in New York, with the average inpatient stay at NYP costing 74% more than the average of other major New York City hospitals. These prices are substantially higher than NYP would be able to charge absent the anticompetitive conduct alleged here.

11.     The purpose of NYP's vertical restraints (*i.e.*, the anti-steering restraints it forces on employers, unions, and insurers) is to inhibit competition, by precluding health plans and insurers from encouraging members to seek care from nearby cheaper competitor hospitals offering a similar or higher quality of care. If employers, unions, and insurers were able to take these actions (or even realistically threaten to), this would lead directly to more patients obtaining care from NYP's lower-priced competitors and to lower prices at NYP facilities. Insurance companies, employers, and unions with self-funded plans, like Plaintiff, thus pay substantially more than they otherwise would for healthcare as a direct result of NYP's anticompetitive practices.

12.     Despite its nominal nonprofit status, NYP has profited handsomely from its anticompetitive practices. In 2021, NYP—a purported non-profit—reported a profit of almost $1.5 billion, which some believe is likely the biggest annual profit in the history of New York hospitals. In 2022, NYP's operating revenue was $10.7 billion and its net operating income was $201 million. In 2023, NYP's operating revenue was $12.5 billion and its net operating income was $343 million. NYP has used these outsized profits to pay extraordinary amounts to the executives of the supposedly charitable institution. The CEO of NYP paid himself $63.7 million over the last five years of reporting, for an average of nearly $13 million per year. In 2020, NYP's

CEO was the highest-paid hospital executive in New York. NYP's COO was the third highest-paid hospital executive in New York, with compensation totaling $7.3 million. Dozens of other executives at this "non-profit" are paid over $1 million in compensation every year. This outsized compensation is nothing new for NYP. For example, in 2012, NYP's former CEO, who had retired the previous year, received a $5.6 million golden parachute, including $1 million in base salary, a $1.8 million bonus, and more than $2 million in deferred compensation.

13.    By claiming non-profit status despite being a multi-billion-dollar profitable enterprise, NYP avoids paying hundreds of millions of dollars in federal, state, and local taxes on profits by promising to pursue a primarily charitable purpose. However, NYP has been criticized for providing too little charity care, suing patients who can't afford to pay, and engaging in aggressive practices to undermine union health plans' efforts at cost savings.

14.    This case seeks to compensate the employers, unions, local governments, insurers, and other payers that have directly paid NYP for healthcare services and have thus been directly harmed by NYP's past illegal activity, and to enjoin NYP from continuing unlawful practices that harm New York's economy and healthcare system.

## II.    PARTIES

### A.    Plaintiff

15.    Plaintiff CCWDC Welfare Fund is a self-funded union health plan that provides health benefits to over 1,700 union members, dependents, and retirees of the Cement & Concrete Workers District Council in New York City. CCWDC Welfare Fund has used its funds to purchase inpatient services directly from NYP over the past four years at rates inflated by NYP's anticompetitive conduct.

**B.    Defendant**

16.    Defendant NYP is a New York not-for-profit corporation with its principal place of business in New York, New York.  It may be served with process by the Secretary of State by mail at New York-Presbyterian Hospital, Office Of Legal Affairs and Risk Management, Box 36, 466 Lexington Avenue, 13th Floor, New York, NY 10017.  NYP provides medical services at more than 190 locations and encompasses hospital campuses, primary and specialty care clinics and medical groups, and an array of telemedicine services.  NYP is one of the nation's largest hospital systems and provides inpatient, ambulatory, and preventive care in all or substantially all areas of medicine.  NYP has over 4,000 beds and more than 10,000 affiliated physicians.  NYP sees more than 2 million visits annually.

17.    NYP as it currently exists is the result of a lengthy and aggressive merger and acquisition strategy.  NYP has described itself as a "health-care powerhouse" due to its mergers and touted that it was the first academic hospital system in the country "to achieve total consolidation."  NYP acquired a hospital in Cortlandt, New York in late 2014, acquired New York Methodist Hospital in Brooklyn in December 2018, and has acquired or affiliated with numerous inpatient and outpatient practices in recent years.

## III.    JURISDICTION AND VENUE

18.    This Court has personal jurisdiction over NYP because NYP is a resident of New York and because the anticompetitive conduct at issue in this litigation took place primarily in New York.

19.    This Court has subject matter jurisdiction over Plaintiff's federal claims under 15 U.S.C. § 15 and 28 U.S.C. § 1331.

20.     Venue is appropriate in this Court under 28 U.S.C. § 1391 and 15 U.S.C. § 22 because NYP is domiciled in this judicial district and/or because a substantial part of the events or omissions giving rise to this action occurred in this judicial district.

## IV.     OVERVIEW OF HOSPITAL/INSURANCE MARKETS AND CONSOLIDATION

### A.     Hospital/Insurance Negotiations Within a Functioning Market

21.     The market for hospital services is different from other product/services markets because the person consuming the hospital services (the patient) does not negotiate—and in many cases, does not even know beforehand—the price of the services they are consuming.  Nor does the patient typically pay the vast majority of the costs of the medical services they consume. Instead, for insured individuals, those costs are paid primarily by their health insurance plan.

22.     Many businesses, unions, and local governments offer commercial health plans to their employees.  In a "fully insured" health plan, the employer and its employees pay premiums to an insurance company which, in turn, bears insurance risk and pays the bills from hospitals and other providers.  In a "self-funded" health plan, by contrast, the employer bears the insurance risk and directly pays the vast majority of the healthcare expenses their employees (and their employees' dependents) incur, though they generally rely on third-party administrators ("TPA") to process claims and otherwise manage the day-to-day affairs of the self-funded health plan. Plaintiff operates a self-funded plan.  For simplicity, this Complaint refers to self-funded health plans and health plans operated by insurance companies for fully insured entities collectively as "commercial health plans" or "health plans."

23.     Commercial health plans build healthcare "provider networks," which consist of the providers with whom the health plan has a contract to provide services to the health plan's members at contracted rates.  This leads to the commonly used term of a provider being "in-network" for a health plan.  Members typically receive more generous coverage from their health

plan when they visit an in-network provider, which incentivizes them to do so.  Going to an "out of network" provider, in contrast, generally means higher costs and more uncertainty for both the member (in terms of out-of-pocket costs, frequent surprise bills, and paperwork burden) and their health plan (in terms of higher prices than those offered to plans that include the provider in-network and significant administrative burden).

24.     For both practical reasons and because of contractual restrictions, most self-funded health plans do not assemble their own provider networks.  It would be practically impossible for every employer, union, and local government to conduct individual negotiations with the many providers where employees and dependents might receive care.  Providers would also refuse to negotiate thousands of separate contracts with individual self-funded health plans.

25.     Accordingly, another set of companies, referred to here as "Network Vendors," assemble provider networks through negotiation with hospitals and other healthcare providers. Network Vendors then allow self-funded health plans to "rent" or access the networks they have assembled.  Network Vendors negotiate with providers on price, attempting to balance the need to build networks with an adequate number of providers and the need to build networks that offer reasonable prices.  The prices negotiated between Network Vendors and providers for in-network care are known as "allowed amounts."

26.     For a Network Vendor's network to be commercially viable (*e.g.*, for it to be one an employer or union would choose to offer its employees or members), it must include enough providers across the full spectrum of healthcare services patients may need or want, from primary care to complicated inpatient hospital surgical care to specialty practices.  And because members generally insist on receiving their healthcare near where they live or work, a plan will not be viable if the provider network does not include a sufficient number of providers in these locations. The

network must also include any providers and facilities that commercial health plans and a significant number of their members desire to be able to access at in-network rates.

27.     Network Vendors tend to be large, well-known insurance companies like Anthem BCBS (formerly known in New York as Empire BCBS), United HealthCare, and Cigna that have the scale and technical knowledge to build networks. In some cases, the Network Vendor also serves as the TPA. A self-funded health plan can therefore contract with a company both for use of its network and to administer the plan. The self-funded health plan directly pays providers for in-network services at the prices negotiated by the Network Vendor; pays the Network Vendor for access to the network; and pays the TPA a fee for the administration of the plan. Critically, self-funded health plans do not have control over the prices negotiated by the Network Vendors that the plans are responsible for paying.

28.     Because Network Vendors are typically large, well-known insurance companies, they often use the same provider networks for the commercial health plans they offer to fully-insured employers. These plans operate in a similar way to self-funded employer plans: the prices are determined by the Network Vendors' negotiations with providers and the plans are subject to the same restraints described below. In the case of fully-insured plans, the insurers pay the provider directly for the claims for services rendered.

29.     Network Vendors generally do not engage in a separate negotiation for each covered medical service. Rather, Network Vendors generally engage in a single negotiation for clusters of services that will be available to commercial health plans that use the network. Those commercial health plans then offer that entire cluster of services to their members as "in-network" benefits. If a commercial health plan's Network Vendor and a hospital reach a deal for a cluster of services (for instance, all acute inpatient hospital services), the hospital will generally be

considered in-network for every service in that cluster. This means that for any service in that cluster, if a commercial health plan's member receives that service from the hospital, the patient will pay the required out-of-pocket costs set forth in their health plan documents and the plan will pay the hospital the remaining portion of the allowed amount the Network Vendor negotiated.

30.    In competitive markets—markets in which there is free competition among a large number of hospitals or other facilities for inclusion in commercial health plans offered to members—a Network Vendor will contract with a hospital or other facility for a bundle of services only when the hospital offers services that are competitively priced and of sufficiently high quality. Network Vendors may, and often do, decline to include in their networks any services from a hospital or other facility if that hospital's or facility's prices or quality of care are not competitive with other nearby providers.  Similarly, a Network Vendor may include as in-network only some clusters of services at any given hospital or hospital system.  For instance, the Network Vendor may include one hospital in-network for all acute inpatient hospital services but may choose not to include that hospital in-network for outpatient hospital services (visits not requiring an overnight stay) because the Network Vendor has identified ways for plans to purchase higher quality care and/or less expensive versions of those outpatient services from a nearby competing hospital or another outpatient provider.

31.    In competitive markets, these dynamics spur price and quality competition among providers.  Providers know that if their prices are too high or their quality of care too low, Network Vendors will decline to contract with them and will instead contract with other, higher-value providers.  Providers generally do not want to be excluded from insurance networks because patients are much less likely to obtain medical services from an out-of-network provider, and

collecting revenue for out-of-network care is slower, more expensive, and more uncertain, so exclusion from networks deprives the provider of patient volume and revenue.

32.    Beyond removing high-cost providers from their networks, Network Vendors and health plans can secure low prices from hospitals and other providers through steering, or the threat of steering.  Network Vendors and health plans may, for a variety of reasons, include both higher-cost and lower-cost providers within the same network.  Through steering, however, the Network Vendors and health plans can incentivize their members to obtain care from one of the lower-cost providers that offers the same or better quality of care as any higher-cost providers within the network.  For example, commercial health plans might charge their members lower co-pays or lower co-insurance percentages if they use lower-cost providers.

33.    The threat of steering creates similar incentives as the threat of exclusion. If providers know that they *could* lose patient volume because their prices are too high, they are less likely to demand unjustifiably high prices.  The possibility of steering, therefore, enhances price competition between hospitals for inclusion in networks and/or preferential treatment within an insurance plan designed to steer more patients towards better value providers.

34.    One form of steering, called "tiering," involves the creation of "tiered" networks or "tiered" plans, in which low-cost, high-quality providers are placed in a higher "tier" than more expensive and/or lower-quality competitors, and the plan's members are then incentivized (*e.g.*, through lower out-of-pocket costs, such as more generous co-insurance coverage) to choose providers in a higher tier.

35.    Another form of steering is the use of "narrow networks," which consist of a smaller set of healthcare providers than is conventional, and typically exclude the most expensive providers.  Employers and unions that offer health benefits to their members may offer their

members a choice between a broad-network plan and a narrow-network plan, with members who choose the narrow-network plan rewarded with lower premiums and lower out-of-pocket expenses than those who choose the broad-network plan. By offering narrow-network plans, health plans can achieve lower costs when at least some members choose a lower-cost narrow-network plan and, at the same time, incentivize providers to lower their prices so that they will be included within both the broad and narrow networks. Health plans' ability to offer both a broad-network option and a narrow-network option to their members allows them to reduce costs while still meeting the needs of members who want or need wider access. And more broadly, the availability of narrow-network options in the market for health coverage enhances price competition between providers writ large, thereby lowering the prices providers charge for broad-network options, due to the greater choice for employers and unions of more cost-efficient options.

36.    Increased price transparency is another form of steering. If Network Vendors and health plans provide their members with truthful information about the prices for various services at competing facilities, their members are more likely to choose to obtain services at lower-cost facilities, even in the absence of any additional incentives provided by tiering like reduced co-pays or premiums. For example, a member who does not expect to meet her deductible in a given year may choose a lower-cost facility regardless of whether doing so results in lower co-pays or premiums.

37.    Academic research by health economists has demonstrated that when commercial health plans and Network Vendors are free to engage in these forms of steering, employers and health plans pay significantly lower costs for healthcare, with no corresponding reduction in health outcomes. Peer-reviewed research studies find that steering reduces health care costs by significant amounts.

38.     Steering not only helps commercial health plans save money on any particular patient; it also encourages higher-priced providers to lower their prices so that health plans steer toward them, or at least do not steer away from them.  Steering is thus an important tool that Network Vendors and commercial health plans can use to exert price pressure on hospitals and providers.  For example, a Network Vendor could secure lower prices from a hospital or other provider by agreeing to place that hospital or provider in the highest tier of its tiered network or to include it in both its narrow-network and broad-network plans.

### B.     Hospital/Insurance Negotiations in a Market Distorted by Anticompetitive Behavior

39.     The unique mechanics of the healthcare market provide an opportunity for hospital systems with market power to anticompetitively restrain trade through unduly restrictive negotiations and agreements with Network Vendors and health plans in order to extract supracompetitive prices.  Supracompetitive prices are rates that are higher than would result from an unfettered competitive process.  In the market for hospital services, supracompetitive prices come in the form of inflated allowed amounts, which are the rates negotiated by Network Vendors and paid by commercial health plans.

40.     One form of anticompetitive behavior that hospital systems with market power may engage in is the imposition of "anti-steering" provisions in their contracts with Network Vendors or health plans.  When a hospital system has market power, it may be practically impossible for Network Vendors and health plans to exclude that system from their all of their networks, but Network Vendors and health plans could still use steering to encourage employees/members to choose lower-cost, higher-quality providers when possible.  A hospital system with market power may be able to thwart this form of price and quality competition by forcing Network Vendors and

14

their health plan clients to agree to "anti-steering" restrictions or by otherwise restricting efforts to use steering.

41.    These anti-steering measures can take many forms, such as preventing Network Vendors and health plans from favoring other providers through financial incentives or other inducements, from placing any other provider in a higher tier than the hospital system with market power, from creating narrow networks that exclude the hospital system with market power, or from sharing truthful pricing information with their members.  These anti-steering measures essentially require commercial health plans to grant the hospital system a "most favored nation" status.  As detailed below, NYP forces anti-steering restraints on all or nearly all Network Vendors and health plans, including but not limited to NYP's imposition of the All Products Clause in its contracts with all or nearly all Network Vendors.

42.    There is a widespread, bipartisan consensus that anti-steering restrictions harm competition and result in higher prices for insurers, employers, unions, and consumers.

43.    In 2016, former President Obama's Department of Justice brought a Sherman Act suit against Atrium Health, a North Carolina hospital system that imposed anti-steering and anti-tiering provisions on commercial health plans in the Charlotte area.  In the lawsuit, the government alleged that the system "prevent[ed] insurers from offering tiered networks that feature hospitals that compete with [the system] in the top tiers, and prevent[ed] insurers from offering narrow networks that include only [the system's] competitors."  The government further alleged that these and other "steering restrictions reduce competition resulting in harm to Charlotte area consumers, employers, and insurers."  After a federal court held that the system's use of anti-steering provisions was plausibly anticompetitive under the Sherman Act, the case settled, and the system

agreed not to impose anti-steering and anti-tiering provisions on commercial health plans going forward.

44.     In 2018, President Trump's Assistant Attorney General for Antitrust also criticized anti-steering provisions, saying, "Without these provisions, insurers could promote competition by 'steering' patients to medical providers that offer lower priced, but comparable or higher-quality services.  Importantly, that practice benefits consumers, but the anti-steering restrictions prevented it."

45.     President Biden's Secretary of Health and Human Services, Xavier Becerra, wrote in his previous role as California Attorney General that contracting practices that "prevented insurers from using steering and tiering" were among types of "anticompetitive conduct" that "discouraged competition, impaired price-conscious consumer choice, and resulted in inflated prices on a system-wide basis that exceed its competitors and exceed the prices its hospitals and its other providers could charge in a free, competitive market."

46.     Because of the nature of the healthcare market, in which the people using services (patients in consultation with their providers) are not the same as the entities primarily paying for services (self-funded health plans and commercial insurers), there is a consensus in healthcare policy and economics that anticompetitive restraints imposed on health plans by hospital systems with market power block rival providers from competing on cost and quality of care; constrain the choices of consumers and health plans by limiting the availability of pricing and quality of care information; remove incentives for new providers to enter the market; bar Network Vendors, TPAs, and health plans from developing lower-cost network options to compete with their rivals; and have other anticompetitive harms detailed below.  And because of the nature of the healthcare market outlined previously, these harms to competition take place even if, on paper, consumers

have still "choices" among providers.  Thus, they foreclose key methods of competition that Network Vendors and commercial health plans would normally use to encourage price and quality of care competition between providers.

47.    A May 2022 academic study in Health Affairs concluded that tools like steering, tiering, and transparency in pricing are particularly important to preserve competition after mergers like the ones NYP has engaged in:  "In addition to proactive oversight of mergers, acquisitions, and joint contracting, the actions of policy makers, insurers, and employers to empower healthcare consumers with information and incentives to choose lower-cost providers may help mitigate the price effects of consolidation.  To this end, employers and health plans have increasingly offered enrollees access to cost transparency tools and benefit designs that include tiered copayments, reference-based pricing, and incentives to seek care at centers of excellence.  Such 'steering' mechanisms have been shown to lower costs and put downward pressure on prices."  Yet, those specific tools the study identified as important to maintaining competition are precisely the tools that NYP has suppressed through the vertical restraints it has forced on Network Vendors, including but not limited to via the imposition of the All Products Clause.

## V.    RELEVANT MARKETS

48.    Judgment may be entered against NYP for the illegal conduct described in this complaint without precisely defining the particular markets that NYP's conduct has harmed or demonstrating NYP's market power in those markets.  NYP's ability to persistently charge supracompetitive prices throughout New York City is direct evidence of NYP's market power that obviates the need to precisely define relevant markets and assess market power indirectly through the use of market shares.  Likewise, NYP's ability to impose anticompetitive contract terms in all, or nearly all, of its agreements with Network Vendors, health plans, and insurers—and to limit the

ability of its competitor-hospitals to work with Network Vendors to create tiered and narrow networks—is direct evidence of NYP's market power that obviates the need to precisely define relevant markets and assess market power indirectly through the use of market shares.

49.    Notwithstanding the foregoing, the markets that are relevant to the illegal conduct described in this Complaint are properly defined herein.

### A.    Relevant Product Market

50.    The relevant product market in this action is the market for acute inpatient hospital services, sometimes referred to as general acute care ("GAC") services (the "Relevant Product Market"). This market for acute inpatient hospital services includes sales of such services to individual, group, fully insured, and self-funded health plans. NYP sells these services at each of its facilities, although not every facility offers the exact same cluster of services.

51.    Acute inpatient hospital services consist of a broad group of medical and surgical diagnostic and treatment services that include a patient's overnight stay in the hospital. Although individual acute inpatient hospital services are not substitutes for each other (*e.g.*, orthopedic surgery is not a substitute for gastroenterology), Network Vendors typically contract for acute inpatient hospital services as a cluster in a single negotiation with a hospital

52.    Moreover, non-hospital facilities, such as independent outpatient facilities, specialty facilities (*e.g.*, nursing homes), and facilities that provide long-term psychiatric care, substance abuse treatment, and rehabilitation services do not offer services that are viable substitutes for acute inpatient hospital services. Health plans' and consumers' demand for acute inpatient hospital services is generally inelastic because such services are often necessary to prevent death or long-term harm to health. Thus, acute inpatient hospital services can be treated analytically as a single product market. Acute inpatient hospital services have been accepted as a

relevant product market by many courts in antitrust actions brought by the Federal Trade Commission.

53.    The market for acute inpatient hospital services has extremely high barriers to entry relative to other product markets.  These barriers to entry include, but are not limited to, the need to spend significant money to build expensive facilities; the difficulty of hiring skilled staff (such as surgeons and anesthesiologists with specialized licenses to practice in the specific geography); extremely onerous regulatory hurdles for opening a new hospital, such as obtaining approval from state and local officials; the limited availability of real estate available to build new hospitals in New York City; and the many years required to build a new hospital.

54.    The Relevant Product Market does not include sales of acute inpatient hospital services to government payers, *e.g.*, Medicare, Medicaid, and TRICARE (covering military families), because healthcare providers' negotiations with commercial Network Vendors and health plans are separate from the process used to determine the rates paid by government payers.

### B.    Relevant Geographic Market

55.    The relevant geographic market is no larger than New York City.  The New York City geographic market comprises the five boroughs of New York City.

56.    Patients generally seek inpatient care from hospitals in the areas where they live and work and where their local physicians have admitting privileges.  As stated in an FTC study, "In healthcare markets, distance to medical provider is one of the most important predictors of provider choice."  Courts have likewise recognized that "people want to be hospitalized near their families and homes, in hospitals in which their own – local – doctors have hospital privileges."  Given this, patients do not typically regard hospitals that require significant travel time as substitutes for local ones, particularly when they have little or no financial incentive to travel

greater distances.  Consequently, an insurance network that does not satisfy patient demand for access to conveniently located hospitals will not be commercially viable.

57.     Network Vendors who seek to sell their networks to employers located in New York City or with employees in New York City must include acute inpatient hospital services from hospitals in New York City in their networks.  This is because people who live and work in New York City strongly prefer to obtain acute inpatient hospital services in New York City, and it could be medically inappropriate and infeasible to require them to travel farther.  Commercial health plans with members in New York City have little or no willingness to select a Network Vendor whose network provides no in-network access to acute inpatient hospital services located in New York City.  Moreover, New York state network adequacy regulations require health plans operating in New York City to offer in-network access to multiple hospitals in New York City and to "contain a sufficient number and array of providers to meet the diverse needs of the insured population and to ensure that all services will be accessible without undue delay.  This includes being geographically accessible."

58.     Health plans covering members who live or work in New York City do not regard hospitals offering acute inpatient services outside of New York City as reasonable alternatives for hospitals offering acute inpatient services within New York City.  Accordingly, Network Vendors seeking to build provider networks that would be attractive to those residents and their employers would not regard acute inpatient hospital services from hospitals outside of New York City as reasonable alternatives for acute inpatient hospital services from hospitals within New York City.

59.     For these reasons, competition from providers of acute inpatient hospital services located outside of New York City would not likely be sufficient to prevent a hypothetical

monopolist provider of acute inpatient hospital services located in New York City from profitably imposing small but significant price increases for those services over a sustained period of time.

60.    The government of the City of New York, the non-partisan Urban Institute think tank, and the leading bond rating service Fitch all define "New York City" as a geographic market for hospitals, including when evaluating consolidation and competition.

61.    As the evidence below makes clear, NYP has market power in the acute inpatient hospital services market in New York City despite having under 50% market share in the relevant geographic market.

## VI.    ANTICOMPETITIVE CONDUCT

62.    NYP has engaged in some of the most flagrantly anticompetitive contracting and negotiating tactics of any hospital system in America.  NYP imposes anticompetitive terms on Network Vendors that limit Network Vendors' ability to build efficient networks based on price or quality, that block health plans from directing members to the highest value care, that prevent health plans from offering narrow networks, and that prevent individuals from knowing the price of care before they receive it.

63.    NYP imposes and enforces anti-steering restraints on all or nearly all Network Vendors and health plans that operate in New York City.

64.    These restraints take or have taken multiple forms, including prohibiting Network Vendors and health plans from incentivizing members to seek care at lower-priced competitors of NYP's, prohibiting Network Vendors and health plans from using tiered networks in which NYP is not in the top tier ("anti-tiering" restraints), prohibiting Network Vendors and health plans from offering any narrow-network or other plans that exclude NYP (the "All Products" requirement), and prohibiting Network Vendors and health plans from even sharing truthful pricing information

21

with their members ("gag clauses").  NYP has imposed and enforced these restraints through contract provisions, negotiating tactics, and other measures to prevent Network Vendors and health plans from engaging in steering.  Network Vendors and health plans do not want to accept these restraints but, with rare exception, have no practical alternative because of NYP's market power.

65.    32BJ SEIU is one of the New York's largest unions and sponsors a self-funded health plan that covers about 200,000 lives.  After analyzing its claims data, 32BJ determined that NYP was charging, on average, 358 percent more than Medicare, which was significantly more than competing hospitals were charging for the same care.  For example, 32BJ's data showed that NYP charged approximately $41,000 for caesarean-section deliveries, compared with $30,000 at Mount Sinai Health System and less than $18,000 at city hospitals.  In light of this data, 32BJ designed an innovative maternity care program through which it would steer members in need of maternity services away from NYP and toward hospitals with which it was able to negotiate reasonable prices.  However, NYP was able to force 32BJ to stop steering members away from NYP because of an anti-steering restriction it imposed on Anthem, 32BJ's Network Vendor. Specifically, NYP told 32BJ that if 32BJ wanted to continue operating its program, NYP would need to be included as a preferred provider, even though including NYP as a preferred provider would make no economic sense for 32BJ and would undermine the program's purpose and effectiveness.  32BJ's effort to find alternative networks resulted in them learning that all or nearly all Network Vendors in New York City were subject to NYP's anti-steering contractual restrictions.

66.    An analysis of tiered health plans offered by major Network Vendors in New York City reflects NYP's use of anti-steering/tiering restrictions.  For example, in plans offered by Aetna, NYP is ranked in the top tier despite being much higher-priced than the other in-network

providers, including providers in less-preferred tiers. Including NYP's high-priced services in a health plan's top tier of providers makes no economic sense and can be explained only by the anti-steering/tiering restrictions that prohibit insurers from placing NYP anywhere other than the top tier. Similarly, in plans offered by United HealthCare, NYP is ranked in the top tier despite being much higher-priced than the other in-network providers. NYP's limitations on tiering are manifested in the distortion of tiered plans offered by Network Vendors in New York City.

67. Cigna (a major Network Vendor) and Northwell Health (a major hospital system with substantially lower prices than NYP and generally the same or higher quality and safety ratings) attempted to develop an insurance network that would exclude NYP and therefore offer a lower-cost product for employers. However, as the Wall Street Journal reported, NYP invoked its "All Products" restriction to block them from doing so, as that restraint barred Cigna from offering *any* networks that did not include all of NYP's overpriced facilities.

68. In a comment to the Wall Street Journal about NYP's "All Products" restriction, Cigna's chief medical officer stated that "No hospital system should be able to exercise market power to demand contract agreements that prevent more competitively priced networks."

69. NYP also uses its market power to impose "all or nothing" contracting on Network Vendors. NYP requires Network Vendors who want to include any *one* of NYP's facilities in their networks to include *all* of NYP's facilities in their networks. This "all or nothing" restraint is especially pernicious because it requires Network Vendors who want or need to include in-network access to any one of NYP's facilities to also include all other overpriced NYP facilities in their networks, and to do so at prices higher than they would otherwise agree to pay.

70. In a competitive market, Network Vendors would select individual hospitals within a hospital system to include their networks based on the price and quality of each individual

hospital. Network Vendors' ability to consider hospitals individually requires each to stand on its own merits while competing for inclusion within any Network Vendor's network, and therefore places competitive pressure on each hospital to lower its prices or improve its quality of care. Excluding a high-priced or low-quality hospital from a network is effectively a form of steering away from that hospital, as taking the hospital out of network discourages members from obtaining care at that hospital and encourages them to obtain care at a higher-quality or lower-priced hospital that is in-network. NYP's imposition of "all or nothing" contracting blocks that form of steering and suppresses price and quality competition, as it allows NYP's higher-priced and/or lower-quality hospitals to obtain inclusion in networks not based on their own merits, but because they are contractually linked to more desirable or "must have" hospitals. NYP's "all or nothing" contracting thus reduces the incentives for NYP to reduce prices or improve the quality of care at its less desirable, lower-quality, or higher-priced hospitals.

71. Similarly, NYP requires Network Vendors to accept the same extremely inflated rates that NYP charges at its flagship hospitals even when their members obtain care at one of NYP's lowest-rated hospitals. For example, health plans pay the same dramatically supracompetitive price of $120,938 for a spinal fusion (a complex procedure where safety is particularly important) at both an NYP hospital that is ranked above-average in safety and an NYP hospital that is ranked well below-average in safety. For comparison, a spinal fusion at the internationally renowned Hospital for Special Surgery, which is ranked higher in quality for orthopedic procedures than NYP, is 30% cheaper, or $83,328. Given the variation among NYP facilities in location, proximity to competitors, quality, ratings, and other factors that would normally affect negotiated rates, Network Vendors would prefer to negotiate separately for each facility, including whether to include any given facility in their networks at all.

72.    NYP's insistence on using this single negotiated rate for a given insurance plan and service across multiple facilities applies to NYP/Weill Cornell Medical Center, Morgan Stanley Children's Hospital, NYP Allen Hospital, NYP Hospital/Columbia University Irving Medical Center, NYP/Westchester Division, NYP Lower Manhattan Hospital, and NYP Westchester.  On information and belief, NYP refuses to negotiate different rates across these combined facilities regardless of their location, proximity to competitors, quality, ratings, or other factors that would normally affect negotiated rates for each facility.  This is reflected in the pricing data it recently began publishing on its website to comply with federal price transparency laws.  While other hospital systems publish separate data files for each of their facilities (which reflect the differing rates across those facilities), NYP publishes only one combined data file for NYP/Weill Cornell Medical Center, Morgan Stanley Children's Hospital, NYP Allen Hospital, NYP Hospital/Columbia University Irving Medical Center, NYP/Westchester Division, NYP Lower Manhattan Hospital, and NYP Westchester.  That combined data file does not differentiate among those different hospitals in any way, and instead reports a single negotiated rate for each insurance plan and service.

73.    NYP's insistence on using a single negotiated rate for a given insurance plan and service across multiple facilities is also reflected in the American Hospital Directory's financial data reports for NYP, which state that "Data for [New York Presbyterian/Weill Cornell Medical Center] includes information for Morgan Stanley Children's Hospital, NewYork-Presbyterian Allen Hospital, New York-Presbyterian Hospital/Columbia University Irving Medical Center, NewYork-Presbyterian/Westchester Division, New York-Presbyterian Lower Manhattan Hospital and NewYork-Presbyterian Lawrence Hospital."

74.     NYP also imposed "gag clauses" that prevented Network Vendors and health plans from telling patients the price of care at NYP before they receive it.  By preventing patients from even knowing the cost of care at NYP, these restrictions directly suppressed price competition.

75.     The Wall Street Journal identified NYP as a hospital system that insisted on "contract clauses [that] prevent patients from seeing a hospital's prices by allowing a hospital operator to block the information from online shopping tools that insurers offer."

76.     In properly functioning markets, pricing information is freely available, allowing purchasers to know the prices they will be obligated to pay their suppliers if they purchase the suppliers' products and services.  The ability to determine the amount of the purchase price before the purchase decision is made allows the customer to compare the prices offered by various competitors and allows the purchase decision to be influenced by price competition.

77.     Because NYP's gag clauses prevented commercial health plans' members from knowing in advance what their cost-sharing responsibility would be for NYP for healthcare services (and how much those prices exceed what they would have been charged by NYP's nearby competitors), NYP faced less commercial pressure to moderate its inflated pricing.

78.     NYP's gag clauses also prohibited Network Vendors from telling health plans about NYP's onerous anti-steering restrictions, forcing them to conceal the anticompetitive terms of the agreements from those who are illegally harmed by them—including the self-funded health plans that bear the cost of NYP's supracompetitive prices. NYP tells Network Vendors that if a health plan tries to use steering, the Network Vendor must terminate the contract but may not explain why steering is not allowed. For example, when a union-sponsored health plan tried to use steering, its Network Vendor told it that if it continued to do so, it would no longer be allowed to access the network, but could not tell them why.

79.    A prominent news report from 2018 hinted at NYP's anticompetitive contract restraints but did not describe them in full and stated that they were kept secret from health plans that did not directly contract with NYP.

80.    NYP's use of gag clauses and other anticompetitive terms effectively undermined price competition for healthcare in the markets NYP serves.  These gag clauses also substantially reduced NYP's rivals' incentives to compete on price because a rival providing lower-priced services could not use a lower price attract consumers to select that service given that consumers were barred from knowing the price of NYP's products relative to the rival's products.

81.    On information and belief, these gag clauses were in part intended to prevent knowledge or scrutiny of other anticompetitive contracting terms.

## VII.    ANTICOMPETITIVE EFFECTS

### A.    NYP's Prices Drive Up Costs for Commercial Health Plans

82.    Prices set by hospital systems like NYP are the primary driver of cost for commercial health plans.  NYP's anticompetitive conduct allows it to set supracompetitive prices that commercial health plans must pay.  Commercial health plans like Plaintiff's have made millions of dollars in direct payments to NYP at the supracompetitive price levels that NYP's unlawful conduct allowed it to charge.

83.    A Harvard University analysis concluded that, "Variation in spending in the commercial insurance market is due mainly to differences in price markups by providers rather than to differences in the utilization of healthcare services. . . . 70 percent of variation in total commercial spending is attributable to price markups, most likely reflecting the varying market power of providers."

84.    NYP's anticompetitive conduct facilitates the supracompetitive prices it bills to commercial health plans. Under federal antitrust precedents, when vertical restraints like those

NYP has forced on Network Vendors lead to higher prices and lower quality, that is direct evidence that the restraints are anticompetitive.

**B.      NYP Charges Supracompetitive Prices throughout New York City.**

85.     NYP's prices throughout New York City are higher than the prices it could charge in a competitive market, and are higher than the prices it could charge if it did not impose the anticompetitive restraints alleged here.

86.     NYP is by far the most expensive hospital system in New York City, charging supracompetitive prices for inpatient procedures and significantly driving up the cost of healthcare for commercial health plans, including Plaintiff's.

87.     When comparing prices across hospitals for acute inpatient hospital services, academic literature compares "standardized prices," which represent the average allowed amount per standardized units of service.

88.     In the following allegations presenting pricing data, "NYP" and "New York Presbyterian Hospital" refer to the group of hospitals listed above for which NYP reports a single negotiated rate for each insurance plan and service.

89.     The standardized price per inpatient stay at NYP is more than 35% more expensive than the standardized price per inpatient stay at NYU Langone—a hospital ranked higher in quality and with a strong reputation as evidenced by its overall higher US News and World Report rankings across facilities, its higher safety ratings on the consumer-focused Leapfrog rankings, and its higher ratings on consumer review websites.  Charging customers approximately 35% more than a nearby and higher-rated competitor would not be possible in a functioning, competitive market, and is instead attributable to NYP's anticompetitive restraints.  More broadly, the standardized price per inpatient stay at NYP is approximately 74% more expensive than the average standardized price per inpatient stay at major non-NYP New York City hospitals.



Standardized Price per Inpatient Stay for Major New York Hospitals

90.    NYP is even more expensive than the hospitals outside of New York that are consistently ranked as the best in the United States and the world.  The Mayo Clinic is consistently ranked as the best hospital in the United States and the world.  The standardized price per inpatient stay at NYP is approximately 56% more expensive than the standardized price per inpatient stay at the Mayo Clinic.  Cleveland Clinic is consistently ranked as the second-best hospital in the United States and the world.  The standardized price per inpatient stay at NYP is more than twice as much as—approximately 111% more expensive than—the standardized price per inpatient stay at Cleveland Clinic.  UCLA Medical Center is consistently ranked as the third best hospital in the United States and one of the best hospitals in the world.  The standardized price per inpatient stay at NYP is approximately 43% more expensive than the standardized price per inpatient stay at UCLA Medical Center.  Massachusetts General Hospital is consistently ranked as one of the best hospitals in the United States and the world.  The standardized price per inpatient stay at NYP is more than twice as much as—approximately 102% more expensive than—the standardized price per inpatient stay at Massachusetts General Hospital.

29

91.     The same discrepancies exist within specific inpatient service lines.  The following examples are illustrative and representative, using service lines as defined by the highly respected, independent RAND Corporation.

92.     The standardized price per inpatient stay in Orthopedics at NYP is $67,631, compared with $56,596 at NYU Langone, which is ranked higher than NYP in Orthopedics quality by US News, and is substantially higher than at other major hospitals in New York City.



93.     The standardized price per inpatient stay in Childbirth at NYP is $60,235, which is between 26% and 67% higher than the standardized price per inpatient stay at other major hospitals in New York City.



Standardized Price for Inpatient Stays, Childbirth

94.     The standardized price per inpatient stay in Circulatory System at NYP is $56,511, which is between 14% and 59% higher than other major hospitals in New York City, including NYU Langone and Mt. Sinai, which are both ranked higher than NYP in Cardiology quality by US News.



Standardized Price for Inpatient Stays, Circulatory System

95.    The standardized price per inpatient stay in Respiratory System at NYP is $75,999, which is between 49% and 117% higher than other major hospitals in New York City, including NYU Langone, which is ranked higher than NYP in Pulmonology quality by US News.



96.    Similar differences exist when comparing prices for specific procedures. When evaluating prices for specific procedures, academic literature suggests comparing "generally homogenous" procedures—*i.e.*, those that generally have little to no variation on quality or cost and occur with sufficient frequency to support empirical analysis.  In a competitive market, the price for generally homogenous procedures would not substantially vary from facility to facility. The following examples are illustrative and representative.

97.    A joint replacement is considered a generally homogenous procedure because it is one of the most common inpatient surgeries with little quality variance among New York City hospitals.  NYP performs hundreds of joint replacements each year, and its price for a joint replacement is $92,485.  NYU Langone charges only $55,029, and the Hospital for Special Surgery—a hospital that specializes in orthopedic surgeries like joint replacement, and that is

consistently ranked the top orthopedic hospital in the nation as well as number one in the world in multinational surveys and provides higher quality orthopedic services than NYP—charges only $74,118.





98.     A spinal fusion (cervical) is another very common inpatient surgery.  Yet, NYP's price for a spinal fusion is $120,938, compared to $83,328 at the Hospital for Special Surgery and $79,022 at NYU Langone.



99.     A Caesarean Section is another common inpatient surgery.  Yet, NYP's price for a C-Section is $42,023, compared to $29,629 at NYU Langone and $29,155 at Mt. Sinai Hospital.



100.     A Coronary Bypass is another common inpatient surgery. NYP's price is $198,625, compared $137,260 at NYU Langone and $134,160 at Mt. Sinai Hospital.

34



101.    These price differences between NYP and its closest, high-quality competitors for these procedures—many of which are considered to be generally homogenous and therefore unlikely to vary on quality across systems—are demonstrative of NYP's significantly higher average overall price, across all inpatient procedures.

102.    These numbers are not cherry-picked: Similar results are demonstrated when comparing systemwide pricing across all acute inpatient hospital services, by procedure.  One standard billing unit of prices for inpatient procedures are Diagnostic-Related Group ("DRG") codes, which are codes hospitals submit to payers for procedures or inpatient stays which, for each Network Vendor, are associated with a price.  DRG codes account for surgical complications and comorbidities, meaning they can be used for direct price comparisons as they adjust for patient acuity. Using publicly available commercial prices posted by each hospital and comparing all publicly available DRGs (736 out of approximately 760 total DRGs or 97% of all DRGs), NYP charges, on average, 61% more than Mt. Sinai Hospital and 66% more than NYU Langone.

103.   NYP would not be able to consistently charge prices 50% higher than these two nearby, high-quality competitors absent the anticompetitive restraints at issue in this case.  Were NYP at risk of being excluded from certain health plans, or being steered away from or placed in a tier below a plan's top tier, it would not be able to maintain such supracompetitive pricing.

104.   NYP's inpatient prices relative to other providers result from NYP's abuse of its market power to control inpatient prices in New York City.  Without the vertical restraints that NYP uses to leverage its market power systemwide, NYP would not be able to maintain these supracompetitive inpatient prices.  If Network Vendors and health plans could use steering or invoke the threat of steering in their negotiations with NYP, it would not be profitable or sustainable for NYP to maintain its high inpatient prices.

105.   The above-described price differentials cannot be explained solely by NYP's market power and are partly or entirely attributable to the anticompetitive contracting restrictions NYP imposes on Network Vendors and commercial health plans.

## VIII.   NYP'S MARKET POWER

106.   NYP has market power in the Relevant Product Market in New York City.

107.   NYP has the ability to persistently and profitably charge prices above those that would be charged in a competitive market.  This is direct evidence of market power.

108.   NYP is, by far, the most expensive hospital system in New York City despite having lower quality and safety ratings than some competitors.  As detailed above, NYP charges substantially higher prices than its competitors across the board, including for "generally homogenous" procedures—*i.e.*, those that generally have little to no variation on quality or cost and occur with sufficient frequency to support empirical analysis—and for procedures in service lines in which its competitors have higher ratings for quality and safety.  In a competitive market,

the price for generally homogenous procedures would not vary as substantially from provider to provider, and NYP would not be able to persistently charge higher prices than higher-quality competitors.  NYP's ability to persistently and profitably charge supracompetitive prices for these procedures, and across all procedures more broadly, is direct evidence of its market power.

109.    NYP is in-network for all significant Network Vendors and, on information and belief, is in-network for over 95% of commercial health plans in New York City.  The fact that NYP is virtually always in-network for these plans, despite its high prices, strongly indicates that NYP possesses and exercises market power in the Relevant Market.

110.    NYP's net revenue per inpatient discharge has increased every year between 2011 and 2022, while net revenue per inpatient discharge for NYU Langone, a competitor hospital with higher quality and safety ratings, declined in 2016 and then remained relatively steady. Nevertheless, NYP has *gained* patients (both absolutely and as a percentage of total inpatient discharges in New York City) during this period.



111.    NYP's extraordinarily high prices would ordinarily entail being excluded from some insurer networks in the Relevant Market; the fact this is rare is strong evidence that NYP has market power and insurers lack the ability to exclude it.

112.    NYP's operating profit per discharge has been consistently high in every year that data is available since at least 2011, with the exception of 2020 (the peak of the COVID-19 pandemic in New York).  These high and stable margins are direct evidence of NYP's market power.



113.    NYP imposes anticompetitive contractual terms, including the All Products Clause and other anti-steering restraints, on most or all Network Vendors and health plans operating in New York City, including the largest Network Vendors.  NYP is able to do so even though Network Vendors and health plans do not want to accept those anti-steering restraints and want to be able to reduce costs by steering and/or creating narrow networks.  NYP's ability to impose anti-steering and other restraints onto Network Vendors and health plans, and the fact that those restraints are not violated, is evidence of market power.  If a hospital system without market power

38

attempted to force these restraints onto Network Vendors and health plans, the Network Vendors and health plans would refuse to accept those restraints, and would refuse to include that system in some or all of their networks or, at a minimum, would include that system only if it lowered its prices below the prices that NYP charges.

114.    NYP's ability to demand a single negotiated rate for a given insurance plan across multiple hospitals—despite significant differences across the hospitals in terms of the set of services offered, geographic locations, and quality—is consistent with NYP dictating/setting prices rather than prices being determined as the outcome of a competitive process involving multiple rivals competing for network inclusion over price and non-price terms.  Setting prices at a high level, insisting on all-or-nothing contracting, and achieving near universal network inclusion, are all evidence that NYP has market power.

115.    NYP's market power is sustainable (and unlikely to be challenged by entrants) in part because of the enormous barriers to entry for any would-be competitor in the market for providing acute inpatient hospital services, which include financial, legal, and regulatory hurdles to obtaining approval for and building a hospital; difficulty of attracting specialized staff in a tight labor market featuring non-compete restraints; and referral networks and medical records rules that disadvantage new entrants.

116.    There is limited excess capacity in many markets for acute inpatient hospital services, including New York City, as it is not financially viable for hospitals to keep a large percentage of their beds empty for significant portions of the year.  Demand for acute inpatient hospital services, however, spikes at various times because of external events (seasonal disorders, disease outbreaks, natural disasters, new substance abuse trends, etc.).  To ensure that health-plan members will have in-network access to at least one provider of acute inpatient hospital services

even during one of these spikes, Network Vendors in these geographic markets typically must include multiple hospitals in their networks, comprising the majority of all inpatient beds.  This dynamic makes it extremely difficult for Network Vendors to entirely exclude from their networks large hospital systems like NYP that own or control a significant percentage of the inpatient beds in a geographic market.

117.    Because of NYP's size, number of facilities, the comprehensiveness of its offerings, and the dynamics outlined above, Network Vendors generally cannot build commercially viable networks that do not include at least some NYP facilities.  And because, as outlined above, NYP uses "all or nothing" contracting, Network Vendors generally must include *all* of NYP's facilities in their networks, including facilities that they would not include on their own merits.

118.    NYP's market power is also clear from a recent dispute between Mt. Sinai Hospital and United HealthCare, which is one of the largest Network Vendors in New York.  During price negotiations in 2024, Mt. Sinai proposed raising its prices by 43% over the next three years.  United HealthCare refused to agree to those prices and dropped Mt. Sinai from its network, announcing that "all Mount Sinai hospitals are out of network for employer-sponsored and individual plans … as of March 1 following Mount Sinai's refusal to move off its demands for egregious price hikes."  Even with the proposed price increases that United HealthCare described as "egregious," Mt. Sinai's prices for acute inpatient services would still have been substantially lower than NYP's prices.  Indeed, Mount Sinai commented during the dispute that "it is just trying to get paid rates that are closer to competitors like New York-Presbyterian." The fact that United HealthCare was willing and able to drop Mt. Sinai from its network, but has not dropped NYP from its network despite even higher prices, is evidence of NYP's market power, particularly since NYP is not a

higher-quality hospital system than Mt. Sinai.  Mt. Sinai and United Healthcare later reached an

agreement, presumably for lower rates than Mt. Sinai proposed.

119.    NYP's size gives it substantial market power.  NYP is, in its own words, "one of

the nation's most comprehensive, integrated academic healthcare systems, encompassing hospital

campuses, primary and specialty care clinics and medical groups, and an array of telemedicine

services ... [w]ith more than 190 locations in Manhattan, Queens, Brooklyn, Westchester, and

Putnam Counties."

120.    NYP also has market power because of its perceived status among certain segments

of consumers in New York City.  Specifically, many executives and other individuals employed

in high-ranking positions have a strong preference for receiving care at NYP, in large part because

of perceived reputational and social benefits associated with receiving care at NYP.  NYP provides

special services specifically to wealthy executives and other high-income individuals.  For

example, it has an "elite" wing of the hospital catering to wealthy patients that offers luxury

amenities not available to ordinary New Yorkers and not available at many other New York City

hospitals.

121.    Because a substantial number of these high-ranking, influential employees demand

that their employers provide in-network access to at least some of NYP's facilities, and because

ERISA generally prohibits self-funded health plans from offering different benefits to high-

ranking employees compared to rank-and-file employees, Network Vendors' networks will not be

commercially viable in New York City if they do not include in-network access to at least some

of NYP's facilities.  NYP uses its resulting market power to impose anticompetitive restraints on

Network Vendors and health plans, including the All Products Clause and other anti-steering

restraints.  Those restraints enable NYP to demand prices higher than it otherwise could and to

obtain patient volume greater than it would obtain absent those restraints.  For example, without NYP's anti-steering restraints—*i.e.*, if Network Vendors and health plans were able to engage in steering—many patients who would otherwise choose NYP (because of its location, perceived status, or any other factor) would instead choose a lower-priced competitor, which would both reduce costs for those patients' health plans and place competitive pressure on NYP to lower its prices.  By using its market power to block steering and selective contracting (*e.g.*, the creation of narrow networks), NYP thwarts that price competition and interferes with free competition.

122.    NYP's market power is widely reported and recognized by industry observers, market participants, government officials, and media outlets.

123.    A national media outlet has accurately referred to NYP as a "massive hospital system" and accurately stated that NYP has "leverage over even the largest insurers" in setting prices.

124.    A national media outlet has accurately stated that "New York-Presbyterian — like many other large, tax-exempt hospital systems across the country — has built a regional medical empire."

125.    A New York-based media outlet has accurately described NYP as "one of the state's most influential hospital systems" in a story detailing NYP's efforts to prevent competitors from opening a nearby cardiac care facility.

126.    A 2018 study funded by the New York State Health Foundation found that NYP was "the financial powerhouse of New York's health systems" and described it as having "significant economic power and ability to shape the health system."

127.    A study by the NYS Health Foundation indicated that an inpatient facility in Brooklyn affiliated with NYP was able to charge significantly higher prices than nearby inpatient

facilities (including more prestigious academic medical centers) because of its affiliation with the broader NYP system. NYP's ability to charge a supracompetitive price at this small facility, despite nearby competition from larger, high-quality competitors is evidence of NYP's market power.

128.    In a comment to the Wall Street Journal about NYP's contract restrictions, Cigna's chief medical officer stated that "No hospital system should be able to exercise market power to demand contract agreements that prevent more competitively priced networks."

129.    One healthcare policy expert has stated that NYP's "market power has allowed [it] to charge higher prices to insurers."

130.    NYP has described itself as a "health-care powerhouse" and touted that it was the first academically-affiliated hospital to achieve "total consolidation."

131.    For all the reasons outlined above, NYP's possesses market power, even though it has less than 50% market share in the acute inpatient hospital services market in New York City. The above direct evidence of NYP's market power obviates the need to evaluate market power via market share percentages, which are an imprecise measure of market power in markets for inclusion in networks, rather than the sale of discrete, fungible objects.

## IX.    ADDITIONAL FACTS REGARDING NAMED PLAINTIFF

132.    CCWDC Welfare Fund is a union health plan headquartered in Bayside, New York. CCWDC Welfare Fund provides a self-funded health insurance plan to union members and their families, including those living in New York City and surrounding areas.  NYP is included in CCWDC Welfare Fund's network, which is subject to the anti-steering, "All Products," and other restraints outlined above.  CCWDC Welfare Fund directly pays the prices NYP imposed on its Network Vendor.

133.    CCWDC Welfare Fund has purchased inpatient services directly from NYP over the past four years at rates inflated by NYP's anticompetitive conduct.

134.    Like other health plans in New York City, CCWDC Welfare Fund has struggled with the rising cost of health care and the rising prices charged by NYP.

## X.    CLASS ALLEGATIONS

### A.    Class Definition

135.    Plaintiff defines the putative class in this litigation as follows:

> All entities whose funds were used to pay Defendant for in-network acute inpatient hospital services in New York City at any point during the period from four years prior to filing to the present (the "Class Period").

136.    Excluded from the class are (1) individuals or entities whose only payments to Defendant were co-pays, coinsurance, and/or other out-of-pocket payments, or any payments for out-of-network claims; (2) Defendant; (3) all federal governmental entities; and (4) the Presiding Judge, employees of this Court, and any appellate judges exercising jurisdiction over these claims as well as employees of that appellate court(s).

137.    This class definition is subject to revision or amendment as the matter proceeds.

138.    The class is ascertainable because it is defined to include only direct payers who paid at least one claim for acute inpatient hospital services to NYP during the Class Period.

### B.    Certification Requirements

139.    Plaintiff does not yet know the exact size of the class; however, based upon the nature of the industry involved, Plaintiff expects that there are thousands of class members. Therefore, class members are so numerous that joinder is ultimately impracticable.

140.    Because NYP has acted in a generally consistent manner applicable to the class writ large, questions of law and fact common to the class exist as to all members of the class and

predominate over any questions affecting only individual members of the class. The common questions include, but are not limited to:

a.    The definition of the relevant product market and geographic market;

b.    Whether NYP has market power in the relevant market;

c.    Whether NYP engaged in anticompetitive conduct by imposing contractual restrictions that unreasonably restrain trade;

d.    Whether NYP's vertical restraints enable it to charge unlawful supracompetitive prices;

e.    Whether Plaintiff and the proposed class have suffered injury caused by the alleged anticompetitive conduct;

f.    Whether NYP's conduct violates 15 U.S.C. § 1; and

g.    Whether and to what extent Plaintiff and the proposed class members are entitled to an award of compensatory damages and/or injunctive, declaratory, or equitable relief.

141.    Plaintiff's claims are typical of the claims of the other class members. Plaintiff and the other class members have been injured by the same wrongful practices. Plaintiff's claims arise from the same practices and course of conduct that give rise to the other class members' claims and are based on the same legal theories. Because NYP imposes highly similar anticompetitive restraints on all or nearly all Network Vendors, including Plaintiff's, Plaintiff's claims regarding the anticompetitive conduct and the harm it has caused Plaintiff are typical of those of the class.

142.    Plaintiff will adequately represent the interest of all class members. Plaintiff has retained class counsel who are experienced and qualified in prosecuting antitrust and class action cases, and who have been named as lead counsel in multiple class action cases. Neither Plaintiff nor class counsel have any interests in conflict with those of the class members.

143.    This class action is appropriate for certification because questions of law and fact common to the members of the class predominate over questions that affect only individual

members.  Individual joinder of all members of the class is impracticable and class treatment will permit a large number of similarly situated commercial health plans to prosecute their claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would produce.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

    (a) due to the complexity of issues involved in this action and the expense of litigating the claims, many class members could not afford to seek legal redress individually for the wrongs that defendants committed against them, and many absent class members have no substantial interest in individually controlling the prosecution of individual actions;

    (b) when NYP's liability has been adjudicated, claims of all class members can be determined by the Court;

    (c) this action will cause an orderly and expeditious administration of the class claims and foster economies of time, effort and expense, and ensure uniformity of decisions;

    (d) without a class action, many class members would continue to suffer injury, and NYP's violations of law will continue without redress while NYP continues to reap and retain the substantial proceeds of their wrongful conduct; and

144.    This action does not present any undue difficulties that would impede its management by the Court as a class action.  Furthermore, the prosecution of the claims of the class in part for injunctive relief is appropriate because NYP has acted, or refused to act, on grounds that apply generally to the class, such that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

XI.    **CLAIM FOR RELIEF**

<u>**COUNT ONE**</u>
**RESTRAINT OF TRADE IN VIOLATION OF THE SHERMAN ACT**
**(15 U.S.C. § 1)**

145.    The above-alleged paragraphs are incorporated by reference.

146.    Defendant NYP entered into and continues to enter into anticompetitive contracts with Network Vendors and is engaging in unreasonable restraints of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

147.    NYP has market power in the Relevant Product Market in New York City. That market power has enabled NYP to impose anticompetitive restraints in written agreements and/or in contract negotiations with Network Vendors.

148.    Acute inpatient hospital services is a valid Relevant Product Market.

149.    New York City is a valid Relevant Geographic Market.  The relevant geographic market is no larger than New York City, based on the commercial realities of the market and consumers' desire to obtain healthcare close to where they live and work.

150.    NYP has imposed its anticompetitive restraints in its negotiations with all or nearly all Network Vendors it negotiates with in New York, as well as all or nearly all commercial health plans that use networks that contain NYP facilities.

151.    NYP enforces these restraints to prevent steering, tiered networks, narrow networks, and other insurance products that would increase price competition between NYP and its competitors and would thus lower prices in the Relevant Markets.

152.    By compelling Network Vendors to agree to these anticompetitive terms, NYP unlawfully restrains trade and limits the ability of competitors to compete in the Relevant Product Market in New York City.  The anticompetitive effects of NYP's conduct outweigh any purported non-pretextual, pro-competitive justifications.

153.    Because NYP imposes these restraints on all or nearly all Network Vendors and commercial health plans, NYP's anticompetitive contracting terms have affected competition as a whole in the relevant market.

154.    As a proximate result of NYP's unlawful conduct, Plaintiff and members of the proposed class have been, and continue to be, harmed—including by having paid and continuing to pay NYP prices that are higher than they would have been absent NYP's anticompetitive conduct.

155.    On information and belief, Plaintiff and members of the proposed class have also paid higher prices at other hospital systems in New York City due to the upward pressure on prices NYP's conduct has created in the broader market for acute inpatient hospital services in New York City.

156.    Plaintiff and members of the proposed class have been injured in their business or property in violation of the Sherman Act, including in having been subjected to and paying supracompetitive prices to NYP for acute inpatient hospital services during the Class Period.  Such overcharges are the type of injury that the antitrust laws were explicitly designed to prevent, and they are a direct result of NYP's unlawful conduct.

157.    Under 15 U.S.C. § 1 and 15 U.S.C. § 15, Plaintiff and the members of the proposed class have standing to and do hereby seek monetary relief—including treble damages—together with injunctive, declaratory and other equitable relief, as well as attorneys' fees and costs.

## XII.    JURY DEMAND

158.    Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury as to all issues so triable.

## XIII.  PRAYER FOR RELIEF

159.    WHEREFORE, Plaintiff, on its own behalf and on behalf of the proposed class, respectfully requests that this Court enter judgment on its behalf, and on behalf of those similarly situated, and adjudge and decree as follows:

a.    Certify the proposed class, direct that reasonable notice be given to the class, designate the named Plaintiff as class representative and the undersigned counsel as class counsel, and allow Plaintiff and the Class to have trial by jury;

b.    Find that Defendant has unreasonably restrained trade in violation of 15 U.S.C. § 1 and that Plaintiff and the class members have been damaged and injured in their business and property as a result of these violations;

c.    Order under 15 U.S.C. § 15 that Plaintiff and members of the class recover the damages determined to have been sustained by them as a result of the Defendant's misconduct complained of herein, in an amount to be trebled in accordance with such laws, and that judgment be entered against Defendant for the amount so determined;

d.    Enter judgment against Defendant and in favor of Plaintiff and the class awarding restitution and disgorgement of ill-gotten gains to the extent such an equitable remedy be allowed by law;

e.    Award reasonable attorneys' fees, costs, expenses, prejudgment and post-judgment interest, to the extent allowable by law;

f.    Award equitable, injunctive, and declaratory relief, including but not limited to declaring Defendant's misconduct unlawful and enjoining it, its officers, directors, agents, employees, and successors, and all other persons acting or claiming to act on its behalf, directly or indirectly, from seeking, agreeing to, or enforcing any provision in any agreement that prohibits or restricts competition in the manner as alleged herein above; and

g.    Award such other and further relief as the Court may deem just and proper.

Respectfully submitted this 25th day of July, 2025.

/s/ Yinka Onayemi
Yinka Onayemi
(Bar No. 5940614)
Jamie Crooks*
(*pro hac vice* forthcoming)
Michael Lieberman
(*pro hac vice* forthcoming)
**FAIRMARK PARTNERS, LLP**
400 7th Street, NW, Suite 304
Washington, DC 20004
Tel: 619.507.4182
yinka@fairmarklaw.com
jamie@fairmarklaw.com
michael@fairmarklaw.com

* *Counsel of Record*

Frank R. Schirripa
Scott Jacobsen
**HACH ROSE SCHIRRIPA
& CHEVERIE LLP**
112 Madison Avenue, 10th Floor
New York, New York 10016
Phone: (212) 213-8311
*fschirripa@hrsclaw.com*
*sjacobsen@hrsclaw.com*

*Attorneys for Plaintiff and the
Proposed Class*